IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-40652
_____


BILLIE R. WESTBROOK and
MADELINE M. WESTBROOK,

                    Petitioners-Appellants,

        versus

COMMISSIONER OF INTERNAL
REVENUE,

                    Respondent  Appellee.

_____

Appeal from the United States Tax Court
_____
October 30, 1995

Before KING and JONES, Circuit Judges, and KAZEN[*], District
Judge.

PER CURIAM:

    Billie R. Westbrook and Madeline M. Westbrook appeal the

United States Tax Court's affirmance of the Commissioner's

determination of deficiencies and additions to tax for negligence

and for substantial understatement of tax liability for the tax

years 1984-1987.  Finding no error, we affirm.


## I. FACTUAL AND PROCEDURAL BACKGROUND

    Billie R. Westbrook ("Dr. Westbrook") has been a

veterinarian since 1955.  He and Madeline M. Westbrook ("Mrs.

_____

    [*]    District Judge of the Southern District of Texas,
sitting by designation.

Westbrook") were married in 1952. In 1962, Dr. Westbrook founded the Spring Branch Veterinary Clinic (the "Clinic"), at which he worked on a full time basis during the years at issue, 1984-1987. Dr. Westbrook worked at the Clinic from 8 a.m. to 6 p.m. on weekdays, and on Saturday and Sunday mornings, and he was on call for emergencies twenty-four hours a day, seven days a week. During the years in issue, the Clinic's average gross revenues approximated $725,000, and the Westbrooks reported annual income from the Clinic ranging from $114,828 to $224,343.

Mrs. Westbrook has performed services for the Clinic without compensation since its inception. Her primary role has been in marketing the Clinic, although she has also served as the receptionist and "kennel person." Mrs. Westbrook also handled public relations for the Texas Veterinary Medical Association, through which she was able to obtain free advertising for the Clinic by using animals owned by the Westbrooks. Mrs. Westbrook's public relations activities included bringing animals to schools and nursing homes.

## A.    Burton Farm

In October 1976, the Westbrooks purchased Burton Farm, a 299.2 acre farm, with its mineral rights, located in Lee County, Texas. In 1976 and 1977, after investigating the cattle business, the Westbrooks commenced a cattle-raising operation by purchasing twenty Angus cows and one Angus bull. The Westbrooks did not have a business plan for their cattle-raising operation,

and they did not keep detailed records of the venture.  In April 1983, the Westbrooks sold their herd and ceased the cattle operation.  During the years at issue, 1984-1987, the Westbrooks neither kept animals nor performed farming activities at Burton Farm.  Nevertheless, they reported net losses for farming operations at Burton Farm from 1976 through 1987.

In the late 1970s, oil was discovered on Burton Farm, and the Westbrooks commenced oil and gas production in commercial quantities.  On August 16, 1983, the Westbrooks entered a lease agreement giving WCS Petroleum Co. ("WCS") the exclusive right to explore, drill, and produce oil and gas at Burton Farm.  In return, the Westbrooks received a royalty interest--a fractional share of oil production, free of development and operational expenses.  During 1984-1987, the Westbrooks reported net income from oil and gas production on Burton Farm, although they reported net losses from farming operations on Burton Farm for those years.

The Westbrooks arranged for Danny Nowell, a production manager with WCS, to reside at Burton Farm and look after the Burton Farm property and the oil wells.  Nowell lived at Burton Farm from 1983 or 1984 until sometime between 1985 and 1987. Nowell repaired the perimeter fence in order to keep cattle inside, but he did not upgrade the fence in a manner designed to deter oil theft.  No oil was stolen from Burton Farm during the time that WCS was lessee.  The Westbrooks made no written claims

3

to WCS for reimbursement for physical damage to the property, as the lease required, because they incurred no covered damages.

## B.    Billenbrook Farm

The Westbrooks purchased a 211-acre farm in Austin County, Texas known as Billenbrook Farm in 1980.  The Westbrooks did not calculate the number of years that it would take to recoup their investment in the farm or in the livestock they planned to keep at the farm, but their son did prepare a "preliminary business outline" stating: "The purpose of this venture is to build capital assets with the limited physical involvement of the principals [the Westbrooks and their son]."

The Westbrooks' activities on Billenbrook Farm generally consisted of raising cattle and miniature horses.  First, they investigated and then engaged in "embryo transplant" cattle-raising from 1982 to 1984.  Although the Westbrooks investigated the process of embryo transplants and examined existing operations, they failed to obtain appraisals or make income projections.  The Westbrooks never calculated how much it would cost to achieve their professed goal of building a purebred herd, nor did they calculate the cost of production for each embryo-transplant calf.  In 1982, they purchased two Angus heifers to use in the embryo transplant process, and, during 1984, they maintained 14-16 head of cattle on Billenbrook Farm.  The Westbrooks kept cattle on Billenbrook Farm until 1987, but they discontinued the embryo transplants in 1986 because they were losing money from that operation.

4

In 1983, the Westbrooks investigated the miniature horse business and purchased twenty-seven miniature horses. They did not make any written financial projections regarding the miniature horses, or calculate how long it would take to recoup their investment in the horses. The Westbrooks did not insure the horses except when they moved them. They failed to keep fertility records or to perform pregnancy tests on the horses. They never mated any of their mares with another owner's stud, nor offered their stallion's stud services to horses owned by others. The Westbrooks never sold any miniature horses. In August 1985, the Westbrooks donated their entire herd of miniature horses to a tax-exempt, charitable organization.

The Westbrooks reported net losses from operations at Billenbrook Farm in each year from 1980 to 1987. Starting in 1984, they reduced their time spent at Billenbrook Farm out of concern for the profitability of the Clinic. The Westbrooks finally ceased operations at Billenbrook Farm when oil and gas production began at Burton Farm, causing a "drastic change" in their lives.

## C.    Billenbrook Farms, Inc.

On January 18, 1982, the Westbrooks formed Billenbrook Farms, Inc., a subchapter S corporation with its principal place of business on Billenbrook Farm. Dr. Westbrook owned 100 % of the stock of Billenbrook Farms, Inc. during 1984-1987 and all expenses incurred by the corporation were funded by cash provided

5

by the Westbrooks, either as a contribution or a loan.
Billenbrook Farms, Inc. engaged in the activities of breeding and raising purebred dogs and maintaining pygmy goats.  In February 1985, the Westbrooks sold its entire stock of dogs and ceased the dog operation, after determining that success would require a larger stock of dogs and a greater percentage of Dr. Westbrook's time than they were willing to commit.  Billenbrook Farms, Inc. also raised pygmy goats, although it failed to maintain breeding records for the goats or sell any of them.  The goats were treated as an ancillary operation to Billenbrook Farm's miniature horses, and they were taken by Mrs. Westbrook to nursing homes, schools, and petting zoos as part of her public relations efforts for the Clinic.  In September 1985, the Westbrooks donated their entire stock of pygmy goats to a tax-exempt, charitable organization.  Billenbrook Farms, Inc. reported net losses on its income tax returns in each year from 1983 through 1986.

**D.    The Westbrooks' Business Records**

Except for Billenbrook Farm, for which the Westbrooks' son created a brief preliminary business outline, the Westbrooks did not make formalized business plans for any of their activities. The Westbrooks maintained one checking account, from which they paid the expenses for the Clinic, Burton Farm, and Billenbrook Farm.  Billenbrook Farms, Inc. maintained a separate account. Dr. Westbrook annotated each check with a description of the relevant activity, such as "Burton" or "Billenbrook," and he then

sent copies of the checks to his accountant, John Braden. Relying upon Dr. Westbrook's annotations, Mr. Braden entered the check information into a computer program under the designated activity, and the program created an income statement and a balance sheet for each of the Clinic, Burton Farm, and Billenbrook Farm. Braden also used this program to create financial statements for Billenbrook Farms, Inc.

Dr. Westbrook and his staff made some errors in annotating the checks and in disbursing funds from the wrong checking account; therefore, the financial statements created by Braden contained errors that the Westbrooks subsequently failed to correct. As a result, some expenses related to the Westbrooks' individual federal income tax returns were reported and deducted on the Billenbrook Farms, Inc. federal income tax return, while some expenses incurred by Billenbrook Farms, Inc. were deducted on the Schedules F of Burton Farm or Billenbrook Farm, which were part of the Westbrooks' individual return.

**E.   Procedural History**

On June 27, 1991, the Commissioner mailed the Westbrooks a Notice of Deficiency informing them of the Commissioner's determination of additional tax liabilities for the years 1984 through 1987. Following a trial, on December 29, 1993, the tax court sustained the Commissioner's determination of additional tax liability based upon its findings that Dr. and Mrs. Westbrook had no business or profit motive with respect to Burton Farm,

7

Billenbrook Farm, or Billenbrook Farms, Inc.[1]  The tax court also

sustained the Commissioner's application of negligence and

substantial understatement penalties.  On February 28, 1994, the

Westbrooks filed a motion for reconsideration claiming that

approximately 55% of the deductions disallowed by the tax court

had been placed on the wrong schedules of their return, and

asking to be allowed to reclassify the expenses reported for

Burton Farm, Billenbrook Farm, and Billenbrook Farms, Inc., so

that these expenses would be properly deductible.  The tax court

denied the motion for reconsideration, and the Westbrooks

appealed.

## II. STANDARD OF REVIEW

We review the decision of the tax court under the same

standards that we apply to district court decisions.  Thus, we

review the tax court's factual findings for clear error, and

examine issues of law de novo.  Park v. Commissioner, 25 F.3d

1289, 1291 (5th Cir.), cert. denied, 115 S. Ct. 673 (1994);

McKnight v. Commissioner, 7 F.3d 447, 450 (5th Cir. 1993).  A

finding of fact is clearly erroneous when, although there is

enough evidence to support it, the reviewing court is left with a

firm and definite conviction that a mistake has been committed.

United States v. United States Gypsum Co., 333 U.S. 364, 395

---

[1]      The Commissioner had conceded the deductibility of
Billenbrook Farms, Inc.'s losses for 1984 through February 1985.
The tax court's finding that the Westbrooks lacked a profit
motive with respect to Billenbrook Farms, Inc. is thus limited to
the corporation's activities after February 1985.

8

(1948); <u>Henderson v. Belknap (In re Henderson)</u>, 18 F.3d 1305, 1307 (5th Cir.), <u>cert. denied</u>, 115 S. Ct. 573.

We review the tax court's denial of the Westbrooks' motion for reconsideration under an abuse of discretion standard. <u>George v. Commissioner</u>, 844 F.2d 225, 229 (5th Cir. 1988).

## III. DISCUSSION

The tax court sustained the Commissioner's determination of deficiencies totaling $236,157.50[2] for the years 1984-1987, and additions to tax for the same years for negligence (totaling $135,050.19) and for substantial understatement (totaling $59,039.33). In sustaining the Commissioner's deficiencies, the tax court held that: (1) the Westbrooks were not engaged in a trade or business on Burton Farm during the years at issue; (2) the Westbrooks were not entitled to deductions related to their royalty interest in oil and gas produced on Burton; (3) the Westbrooks did not operate Billenbrook Farm for profit during the years at issue; (4) the activities of Billenbrook Farms, Inc. after February 1985 were not for profit; (5) deductions taken by Billenbrook Farms, Inc. after February 1985 were not for ordinary and necessary business expenses; (6) Billenbrook Farms, Inc. was not entitled to deductions erroneously reported on its return

---

[2] The deficiencies assessed for each year were:

| | |
|---|---|
| 1984 | $ 38,624.25 |
| 1985 | $112,712.20 |
| 1986 | $ 72,272.50 |
| 1987 | $ 12,548.55. |

9

that relate to activities of Burton Farm or Billenbrook Farm;
(7) the Westbrooks are liable for additions to tax for negligence
for each of the years at issue; and (8) the Westbrooks are liable
for additions to tax for substantial understatement of tax for
the years at issue.[3]  The Westbrooks filed a motion for
reconsideration, requesting that the court allow them to
recharacterize expenses listed on their tax returns for 1984-1987
and the tax returns of Billenbrook Farms, Inc. for those years,
which was denied by the tax court.

On appeal, the Westbrooks contend that the tax court
committed clear error in finding that they had no good faith
intention of making a profit from their activities at Burton
Farm, Billenbrook Farm, or the activities of Billenbrook Farms,
Inc.  They further contend that the tax court abused its
discretion in refusing to permit them to supplement the record
after the trial to demonstrate that expenses, which were
mistakenly listed on the wrong return, would be properly
deductible if correctly recorded.  The Westbrooks also contend
that the tax court's finding that they negligently prepared their
returns was clearly erroneous, and that the tax court erred in
determining that the Westbrooks lacked substantial authority for
their deductions and thus were liable for substantial
understatement penalties.  The Commissioner maintains that the

---

[3]     The tax court also held that deductions taken by
Billenbrook Farms, Inc. for the educational expenses of the
Westbrooks' son, William Westbrook, while he attended business
school at SMU, were improper; however, the Westbrooks do not
challenge this holding on appeal.

tax court's determinations were correct.  We will address each argument in turn.

## A.    Profit Motive

As a general rule, Internal Revenue Code ("IRC") §§ 162(a) and 212 allow for the deduction of ordinary and necessary expenses incurred in the carrying on of a trade or business (§ 162(a)) or for the production or collection of income (§ 212(1)) or for the maintenance of property held for the production of income (§ 212(2)).  26 U.S.C. §§ 162, 212.  To be engaged in a trade or business under § 162, a taxpayer "must be involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Similarly, the standard for deductibility under § 212 is whether the expenditures were made "primarily in furtherance of a bona fide profit objective independent of tax consequences." Agro Science Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir.), cert. denied, 502 U.S. 907 (1991).  "If an individual incurs a loss in a trade or business, or in any transaction entered into for profit unconnected with a trade or business, IRC § 165(c) permits the individual to deduct the loss." 26 U.S.C. § 165(c); Faulconer v. Commissioner, 748 F.2d 890, 892-93 (4th Cir. 1984).

IRC § 183 governs allowable deductions for expenses incurred in an activity "not engaged in for profit." 26 U.S.C. § 183. Section 183(a) provides that no deductions shall be allowed for

11

an activity not engaged in for profit except as provided in this section.  Id.  Section 183(b) provides that, in relation to an activity not engaged in for profit, a taxpayer can take those deductions which would be allowable without regard to profit motive, and can take deductions which would be allowed if the activity were engaged in for profit, but only to the extent "that gross income derived from such activity for the taxable year exceeds the deductions allowable."  Id.  In sum, section 183 allows deductions for expenses incurred in an activity not engaged in for profit, but only to the extent of gross income from that activity; therefore, taxpayers may not deduct losses incurred in an activity not engaged in for profit.

Section 183(c) defines an activity not engaged in for profit as an activity other than one for which deductions are allowable under §§ 162 or 212.  Id.  The Treasury Regulations promulgated pursuant to § 183 establish an objective test for determining whether a taxpayer is engaging in an activity for profit:

> The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case.  Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. . . .  In determining whether an activity is engaged in for profit, greater weight is given to objective facts rather than to the taxpayer's mere statement of his intent.

Treas. Reg. § 1.183-2(a); Estate of Power v. Commissioner, 736 F.2d 826, 830 (1st Cir. 1984).  The regulations under § 183 also list nine factors to be considered in determining whether a

12

taxpayer has a profit motive with regard to a certain activity: (1) the extent to which the taxpayer carries out the activity in a businesslike manner; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in other similar or dissimilar activities; (6) the taxpayer's history of income or losses attributable to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) any elements of personal pleasure or recreation in the activity. Treas. Reg. § 1.183-2(b)(1)-(9). Courts have consistently relied on these nine factors, originally derived from court opinions, to determine whether a profit motive exists for purposes of deduction of losses under §§ 162 and 212. Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 727 (9th Cir. 1986); Faulconer, 748 F.2d at 896-902; Nickerson v. Commissioner, 700 F.2d 402, 404 (7th Cir. 1983). These factors are not exclusive, and no one factor or mathematical preponderance of factors is determinative. Faulconer, 748 F.2d at 894; Nickerson, 700 F.2d at 404-05.

The profit motive inquiry is a question of fact, our review of which is limited to a determination of whether the tax court committed clear error. Agro Science Co., 934 F.2d at 576-77; Thomas v. Commissioner, 792 F.2d 1256, 1259 (4th Cir. 1986). The Commissioner's assessment of a deficiency is presumptively

13

correct and the taxpayer bears the burden of proving it wrong. United States v. Janis, 428 U.S. 433, 440-41 (1976); Welch v. Helvering, 290 U.S. 111, 115 (1933). Thus, the Westbrooks bear the burden of proving that their activities at Burton Farm, Billenbrook Farm, and Billenbrook Farms, Inc. were engaged in with the primary purpose of earning a profit. See Faulconer, 748 F.2d at 893; Nickerson, 700 F.2d at 404.

### 1. Burton Farm

The Tax Court determined that the Westbrooks' losses from Burton Farm were not deductible because they were not engaged in any animal activity during the years at issue which constituted a trade or business under § 162. The Tax Court also rejected the Westbrooks' argument that their disallowed Burton Farm expenses were incurred to protect their oil and gas royalties, finding that the Westbrooks presented no evidence that they incurred expenses related to oil and gas production at Burton Farm.

During 1984 through 1987, the Westbrooks claimed depreciation deductions for items such as a windmill, fences, barns, troughs, and a tractor, as well as operational expenses including repairs, maintenance, supplies, fuel oil, insurance, legal fees, and travel and entertainment on their Schedule F for Burton Farm. However, in the tax court, the Westbrooks stipulated that they neither kept animals nor conducted farming operations at Burton Farm during the years at issue. The Tax Court's finding that the Westbrooks were not engaged in a trade

14

or business of farming or raising animals at Burton Farm from 1984-1987 thus cannot be considered clearly erroneous. The Westbrooks argue that their operational and depreciation expenses are nevertheless deductible as expenses of oil and gas production on Burton Farm, or, alternatively, because the deductions should be offset against the appreciation in value of the land at Burton Farm.

The tax court found that the Westbrooks failed to present evidence that the expenses listed on their 1984-1987 Schedules F for Burton Farm related to oil and gas production. The tax court noted that the oil and gas lease entered by the Westbrooks and WCS imposed no operational obligations on the Westbrooks. No oil was stolen from Burton Farm during the years at issue, nor was any physical damage to the property sustained from oil development or drilling. Although the Westbrooks argue that the perimeter fence was repaired to protect against oil theft, Dr. Westbrook testified that any repairs to the fence were made by Mr. Nowell to keep Mr. Nowell's cattle on the property, not to keep oil thieves off of the property. We conclude that the tax court did not clearly err in holding that the Westbrooks presented no evidence that deductions taken on the Burton Farm Schedule were incurred in relation to oil and gas production. Because the taxpayer bears the burden of proving its entitlement to a deduction, see Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), we affirm the tax court's holding that the

15

deductions listed on Burton Farm's Schedule F for 1984-1987 were not allowable as costs incurred in oil and gas production.

The Westbrooks additionally argue that their farm-related depreciation and operational expenses should be offset against the appreciation in the value of the land. This argument lacks merit. First, we note that the Westbrooks did not demonstrate appreciation in the value of Burton Farm during 1984-1987 with specific evidence, although, given the production of oil on the land, such appreciation is plausible. However, Treasury Regulation § 1.183-1(d)(1) provides that farming and the holding of land for speculation constitute a single activity only if the income derived from farming exceeds deductions not directly attributable to the holding of the land, thus reducing the net cost of retaining the land. Treas. Reg. § 1.183-1(d)(1); see Estate of Power v. Commissioner, 736 F.2d 826, 829 (1st Cir. 1984). The Westbrooks, however, seek to deduct farming losses based on the appreciation in value of the land, which actually increased the cost of retaining the land.

The Westbrooks also argue that many of the items listed on the Burton Farm Schedule F--such as depreciation of a one-eighth interest in embryo transplant cattle--were related to Billenbrook Farm activities and would be properly deductible if reclassified. Because this argument was the subject of the motion for reconsideration, it will be addressed in relation to the denial of that motion.

16

In sum, we conclude that the tax court did not clearly err in disallowing farming expense deductions with relation to Burton Farm because the Westbrooks neither raised animals nor conducted farming operations on Burton Farm from 1984 to 1987.

**2. Billenbrook Farm**

The tax court held that the Westbrooks' Billenbrook Farm activities--embryo-transplant cattle and other cattle raising and miniature horse breeding--were not engaged in for profit under § 183; therefore, losses incurred in carrying out those activities were not deductible. The tax court determined whether the Westbrooks were motivated by profit by applying the nine factors of Treasury Regulation § 1.183-2(b)(1)-(9).

On appeal, the Westbrooks present a novel "process of elimination" argument. As they explain, a taxpayer's expenses can only be classified into three categories: personal expenses, business expenses, or expenses incurred in other profit-seeking activities. They argue that if no elements of recreation, pleasure, sport or hobby exist with respect to an activity, that activity, by default, must be a business or an activity conducted for the production of income. The Westbrooks reason that because the tax court made no fact findings that their activities at Billenbrook Farm were motivated by personal pleasure, recreation, hobby or sport, the only proper legal conclusion is that they were motivated by profit. We reject the Westbrooks' unique profit motive analysis as contrary to existing precedent. First,

17

personal pleasure or recreational motivation is only one of the nine factors included in the treasury regulations, and the case law clearly holds that no one factor can be determinative. Treas. Reg. § 1.183-2(b)(9); see, e.g., Hendricks, 32 F.3d at 98; Faulconer, 748 F.2d at 895. Furthermore, the Westbrooks have the burden of proof to affirmatively establish a profit motive. Faulconer, 748 F.2d at 893. Holding that a profit motive exists because the tax court did not find a personal pleasure or recreation motive would turn this burden on its head. Whether the requisite profit motive is present must be determined by examining all the facts and circumstances, Nickerson, 700 F.2d at 404; therefore, a balancing of the nine factors and any other relevant consideration is the proper method for determining whether a profit motive exists. See, e.g., Hendricks, 32 F.3d at 98; Burger v. Commissioner, 809 F.2d 355, 358 n.4 (7th Cir. 1987); Estate of Power, 736 F.2d at 829; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981); Givens v. Commissioner, 58 T.C.M. (CCH) 255, 258 (1989).

Considering the facts and circumstances, we conclude that the tax court's finding of no profit motive with respect to Billenbrook Farm is not clearly erroneous. The tax court determined that the Westbrooks did not carry on the activity in a business-like manner. Treas. Reg. § 1.183-2(b)(1). The Westbrooks failed to make complete and accurate records. Although the Westbrooks professed a desire to build a purebred

18

herd of cattle through the embryo transplant process, they made no cost estimates related to that goal and took no steps to achieve it. The Westbrooks kept no records of births, fertility or mating of their miniature horses, nor did they keep track of how many horses died. Although these were ostensibly breeding operations, the Westbrooks also did not keep records of fertility, pregnancy, or calving performance of either their commercial or embryo-transplant cattle.

Another relevant factor is the expertise of the taxpayers and consultation with expert advisors. Treas. Reg. § 1.183-2(b)(2). The Westbrooks have some personal expertise in animal husbandry, evidenced by Dr. Westbrook's profession of veterinary medicine. Although the Westbrooks studied and consulted experts regarding the technical and scientific aspects of horse and cattle raising, they did not seek expert advice regarding the economic or business aspects of these activities. The Westbrooks made no financial projections with regard to either miniature horse-breeding or cattle-raising, nor did they estimate the return of capital invested in these activities.

In determining the existence of profit motive, we also consider the time and effort expended by the taxpayer in carrying on the activity. Treas. Reg. § 1.183-2(b)(3). Dr. Westbrook worked full time, including Saturday and Sunday mornings, at the Clinic. Additionally, he was on call for emergencies with his Clinic patients twenty-four hours a day, seven days a week. Mrs. Westbrook was involved in an ongoing public relations campaign

19

for the Clinic and the Texas Veterinary Medical Association, in addition to participating in other animal husbandry, community, and church organizations. Neither Dr. nor Mrs. Westbrook had much time left to devote to the Billenbrook Farm activities.

The Westbrooks endured a long series of losses from their activities at Billenbrook Farm. Although a series of losses during the start-up stage of a business does not necessarily indicate a lack of profit motive, the Westbrooks' losses extended beyond any initial period. Treas. Reg. § 1.183-2(b)(6); Hendricks, 32 F.2d at 99. From 1980-1987, the Westbrooks reported losses totalling approximately $510,000 from raising miniature horses, embryo-transplant cattle, and commercial cattle. These losses were not demonstrated to be attributable to unforeseen or fortuitous circumstances. The Westbrooks ignored their losses from cattle-raising on Burton Farm when they established operations at Billenbrook Farm. Treas. Reg. § 1.183-2(b)(5) (the success of the taxpayer in other similar or dissimilar activities). They made no sales of miniature horses or embryo-transplant cattle, and they realized no occasional profits. Treas. Reg. § 1.183-2(b)(7).

Substantial income from other sources may indicate that the activity is not engaged in for profit. Treas. Reg. § 1.183-2(b)(8); Hendricks, 32 F.3d at 99. During the years in issue, the Westbrooks' net income from the Clinic approximated $685,000 and their income from oil and gas production exceeded $700,000.

20

The Westbrooks argue that a profit motive exists because they received no personal pleasure or recreation from the Billenbrook Farm activities.  While this fact is relevant to the profit motive analysis, see Treas. Reg. § 1.183-2(b)(9), we believe the tax court did not clearly err in finding it outweighed by other facts establishing the lack of a profit motive.  Similarly, the Westbrooks contend that the tax court erred in failing to consider the appreciation in the value of the Billenbrook Farm land during 1984-1987.  Because the Westbrooks failed to present evidence that the land did appreciate, we reject this argument.  See Hendricks, 32 F.2d at 100 ("[T]he mere expectation that land values may appreciate is not sufficient, in itself, to demonstrate that an activity was engaged in for profit.")  In sum, we conclude that the tax court's finding that the Westbrooks lacked a profit motive with respect to their Billenbrook Farm activities was not clearly erroneous.


### 3. Billenbrook Farms, Inc.

The tax court concluded that Billenbrook Farms, Inc.'s activities after February 1985 were not engaged in for profit under § 183.  After February 1985, Billenbrook Farms, Inc.'s sole activity was raising pygmy goats, which it donated to a tax-exempt organization in September 1985.  The Westbrooks again argue that because they obtained no personal pleasure or recreation from raising pygmy goats, that activity necessarily was profit-motivated.  As we stated above, the proper analysis

21

for determining whether a profit motive exists is a balancing of the nine factors and other relevant objective considerations. The Westbrooks did not present evidence of records pertaining to the goats, any sales of goats, any business analysis regarding the profitability of maintaining goats or any plans or attempt to market them.  The goats were primarily used by Mrs. Westbrook in her public relations campaign for the Clinic, as she took them to schools and petting zoos.  Upon these facts, we conclude that the tax court's finding that Billenbrook Farms, Inc. lacked a profit motive after February 1985 was not clearly erroneous.

## B.    Motion for Reconsideration

In its memorandum opinion, the tax court rejected the Westbrooks' argument that certain expenses of Burton Farm or Billenbrook Farm that were erroneously reported on Billenbrook Farms, Inc.'s income tax return were nevertheless deductible because Dr. Westbrook owned all of the stock of Billenbrook Farms, Inc.  In so holding, the tax court noted:

> if petitioners had properly substantiated these expenses, they could have deducted many, if not all of them on their individual tax returns, not as flow-through deductions from Billenbrook Farms, Inc., but as deductions related to income-seeking activity of their own.  However, petitioners did not make this argument and we decline to reach this issue on our own initiative; petitioners did not substantiate these expenses.

Relying on this language, the Westbrooks filed a motion for reconsideration, asking the tax court to allow them to supplement the record in order to substantiate and reclassify these

22

expenditures. The Westbrooks sought to reclassify some deductions listed on the forms for Burton Farm, Billenbrook Farm, and on the tax return of Billenbrook Farms, Inc. as expenses incurred for the Clinic. The Westbrooks conceded in their motion that their request to reclassify expenses should have been made before trial. The tax court denied the motion for reconsideration. On appeal, the Westbrooks contend that the tax court abused its discretion in denying the motion because the Commissioner did not raise substantiation of the expenses as an issue for trial.

Reconsideration of proceedings is generally denied in the absence of "substantial error" or "unusual circumstances." See CWT Farms, Inc. v. Commissioner, 79 T.C. 1054 (1982), aff'd, 755 F.2d 790 (11th Cir. 1985), cert. denied, 477 U.S. 903 (1986). A motion for reconsideration is not granted "to resolve issues which could have been raised during the prior proceedings." Id. We review the denial of a motion for reconsideration under an abuse of discretion standard. See Tweeddale v. Commissioner, 841 F.2d 643, 646 (5th Cir. 1988); CWT Farms, 79 T.C. at 1057.

We find that through the exercise of reasonable diligence, the Westbrooks could have presented reclassification evidence at trial. See Tweeddale, 841 F.2d at 646. The Westbrooks argue that the Commissioner waived substantiation of expenses because substantiation was not listed as an issue for trial in the pre-trial memorandum. However, the Westbrooks forget that taxpayers bear the burden of proving their entitlement to a deduction.

23

United States v. General Dynamics Corp., 481 U.S. 239, 245 (1987).  Even if the Commissioner had stipulated that the amounts were spent, the Westbrooks would still be required to demonstrate that the expenditures were related to a particular trade or business under § 162, such as the Clinic, or an income-producing activity under § 212.  Furthermore, the record reveals that although the parties stipulated to several exhibits documenting or identifying expenses of the farms, the stipulations indicate that "the truth of assertions within stipulated exhibits is not necessarily agreed to and may be rebutted or corroborated with additional evidence."  Additionally, the Commissioner did not stipulate to any reclassification of expenses in relation to different entities.  The Westbrooks failed to present evidence at trial justifying reclassification of expenses, although the record provides no indication that the reclassification evidence was unavailable at the time of trial.  No extraordinary circumstances exist to justify or excuse the failure of the Westbrooks to present such evidence.  Therefore, the tax court did not abuse its discretion by denying the motion for reconsideration.

## C.    Negligence Penalty

The Commissioner assessed additions to tax against the Westbrooks for negligence under IRC § 6653(a)(1) and (2) for the

1984-1987 taxable years.[4]  The tax court sustained these determinations because the Westbrooks presented insufficient evidence that they were not negligent in preparing their return. On appeal, the Westbrooks argue that the § 6653 negligence penalty cannot apply to them because all of their actions--"from the choice of their one checking account bookkeeping system, to the determination of what was deductible or not"--were taken on the advice of their accountant, John Braden.

Section 6653(a)(1) imposes an addition to tax equal to 5% of the underpayment of tax if any part of the underpayment is attributable to negligence or intentional disregard of the rules or regulations.  26 U.S.C. § 6653(a)(1).  Section 6653(a)(2) provides for a further addition to tax equal to 50% of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of the rules and regulations. 26 U.S.C. § 6653(a)(2).  " `Negligence' includes any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances."

---

[4]     The negligence penalty found at § 6653(a)(1) and (2) in the 1984, 1985, and 1986 Internal Revenue Code is enacted as § 6653(a)(1)(A) and (B) in the 1987 Internal Revenue Code.  For simplicity, we will use the citations from the 1984-1986 codes for all four years.  The amounts of the penalties for each year are as follows:

|  | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|
| § 6653(a)(1) | $ 1,931.21 | $ 5,635,61 | $ 3,613.63 | $  627.28 |
| § 6653(a)(2) | $25,840.40 | $59,949.78 | $32,711.19 | $4,741.09. |

25

<u>Heasley v. Commissioner</u>, 902 F.2d 380, 383 (5th Cir. 1990); <u>Sandvall v. Commissioner</u>, 898 F.2d 455, 458 (5th Cir. 1990).

The tax court's determination of negligence is a factual finding which we review for clear error. <u>Portillo v. Commissioner</u>, 932 F.2d 1128, 1135 (5th Cir. 1991); <u>Sandvall</u>, 898 F.2d at 459. In addition, because the Commissioner's determinations are presumed correct, the taxpayer bears the burden of establishing the absence of negligence. <u>Portillo</u>, 932 F.2d at 1135; <u>Sandvall</u>, 898 F.2d at 459; <u>see also</u> <u>Goldman v. Commissioner</u>, 39 F.2d 402, 407 (2d Cir. 1994); <u>Accardo v. Commissioner</u>, 942 F.2d 444, 452 (7th Cir.), <u>cert. denied</u>, 503 U.S. 907 (1991).

The record demonstrates that the Westbrooks took business expense deductions that were not supported by the facts, primarily because the deductions were taken in relation to the wrong farming activity. For example, a goat house, goats, a barn and a tractor, located at and used by Billenbrook Farm, were listed on the Burton Farm depreciation schedule, although no animals were raised and no farming was performed at Burton Farm during 1984-1987. Furthermore, expenses of Billenbrook Farm's cattle and miniature horse-raising ventures were deducted on Billenbrook Farms, Inc.'s corporate income tax returns. This circuit has previously concluded that a negligence penalty is correctly assessed in cases where deductions claimed on returns are not supported by the facts. <u>Portillo</u>, 932 F.2d at 1135; <u>Sandvall</u>, 898 F.2d at 459.

26

The Westbrooks argue that the tax court's determination of negligence is clearly erroneous because they relied on the advice of their accountant, John Braden, with respect to "everything they did." It is true that a taxpayer may avoid a negligence penalty if he reasonably relies on an accountant's or a lawyer's advice on a matter of tax law. See United States v. Boyle, 469 U.S. 241, 251 (1985); Chamberlain v. Commissioner, 1995 WL 568705 at *2; Heasley v. Commissioner, 902 F.2d at 383. However, the underpayment of tax in this case did not result from Mr. Braden's misinterpretation of a matter of tax law. Rather, the Westbrooks' negligence was an example of garden-variety careless record-keeping--they failed to record expenses with the activity in which the expenses were incurred. The Westbrooks maintain that any errors resulted from their one-checking account bookkeeping system, which was created by Mr. Braden. While this may be true, no legal support exists for the proposition, apparently urged by the Westbrooks, that because an accountant recommends a particular bookkeeping system, the taxpayers are insulated from penalties if they negligently use that system, causing an underpayment of tax.

The Westbrooks also argue that a negligence penalty is inappropriate because they reasonably relied on Mr. Braden to prepare their returns. A taxpayer may rely on an accountant to prepare his income tax return, and thus avoid a negligence penalty, if the taxpayer demonstrates that (1) the return preparer was supplied with all necessary information, and (2) the

27

incorrect return was a result of the preparer's mistakes. <u>Cramer v. Commissioner</u>, 101 T.C. 225, 251 (1993), <u>aff'd</u>, 64 F.3d 1406 (9th Cir. 1995); <u>Weis v. Commissioner</u>, 94 T.C. 473, 487 (1990); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972). The Westbrooks have not satisfied this burden. Two groups of errors in the classification of deductions are demonstrated by the evidence. First, expenses related to Billenbrook Farm were deducted on the Burton Farm Schedules F. The record reveals that these errors may have been caused by Dr. and Mrs. Westbrook's making incorrect notations on the checks. Mr. Braden relied on those notations in determining how to classify the expenses among the Westbrooks' various activities. Mr. Braden testified, however, that some of the Billenbrook/Burton errors may have resulted from his staff person miscoding a check with a correct notation when entering it into the computer program. The Westbrooks fail, however, to direct this court to a portion of the record indicating which mistakes, if any, were made by Mr. Braden, and which were made by the Westbrooks themselves. Second, expenses of Billenbrook Farm were deducted by Billenbrook Farms, Inc. on its corporate income tax return. Mr. Braden testified that, after the audit, he discovered that these expenses were miscoded because Dr. and Mrs. Westbrook and their son, William Westbrook, wrote checks from the Billenbrook Farms, Inc. account to pay expenses of the Billenbrook Farm sole proprietorship activities. Therefore, the Billenbrook Farm/Billenbrook Farms, Inc. classification errors were caused by the Westbrooks' failure to give Mr. Braden correct

28

information.  Because the Westbrooks have not demonstrated that they provided Mr. Braden with correct information, or that the errors on their returns were a result of his mistakes, we conclude that the tax court's finding of negligence was not clearly erroneous.  Therefore, the Commissioner's assessment of negligence penalties under § 6653(a)(1) and (2) for 1984-1987 is affirmed.

## D.    Substantial Understatement Penalty

The Commissioner also assessed additions to tax for substantial understatement of tax liability for 1984-1987 under IRC § 6661.[5]  The tax court affirmed these determinations because the Westbrooks presented no evidence contesting the additions.

Section 6661(a) of the IRC provides for an addition to tax of 25% of the amount of any underpayment attributable to a substantial understatement of income tax for the taxable year. 26 U.S.C. § 6661(a).  A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return, or $5,000.  26 U.S.C. § 6661(b)(1).  The Westbrooks had substantial understatements of tax liability in each year from 1984-1987.

---

[5]    The amounts of the penalties for each year were:

| Year | Amount |
|------|--------|
| 1984 | $ 9,656.06 |
| 1985 | $28,178.00 |
| 1986 | $18,068.13 |
| 1987 | $ 3,137.14. |

The amount of an understatement may be reduced by the portion of the understatement which the taxpayer shows is attributable to either (1) the tax treatment of any item for which there was substantial authority; or (2) the tax treatment of any item with respect to which the relevant facts were adequately disclosed on the return. 26 U.S.C. § 6661(b)(2)(B). Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions." Treas. Reg. § 1.6661-3(b)(1); Accardo, 942 F.2d at 453. The taxpayers bear the burden of proving that the Commissioner's determination of substantial underpayment is incorrect. Weis, 94 T.C. at 490.

The Westbrooks argue that substantial authority exists that their Burton Farm, Billenbrook Farm, and Billenbrook Farms, Inc. deductions were proper business expenses of profit-motivated activities. The Westbrooks took the position that their deductions were proper because they were for expenses incurred in a trade or business under § 162 or a profit-motivated activity under § 212. The Westbrooks argued that they were necessarily motivated by profit because they derived no pleasure from their Burton Farm, Billenbrook Farm or Billenbrook Farms, Inc. activities. As is shown in Part III.A.2 of this opinion, there is not only no substantial authority for this position, but in fact no authority at all. The great weight of legal authority holds that profit motive is determined by weighing all the facts and circumstances, using the nine factors of Treas. Reg. § 1.183-

30

2(b), only one of which is whether elements of personal pleasure or hobby exist.  Treas. Reg. § 1.183-2(b)(9);  <u>see, e.g.</u>, <u>Hendricks</u>, 32 F.3d at 98; <u>Burger</u>, 809 F.2d at 358 n.4; <u>Estate of Power</u>, 736 F.2d at 829; <u>Brannen v. Commissioner</u>, 722 F.2d at 704; <u>Golanty v. Commissioner</u>, 72 T.C. at 426; <u>Givens</u>, 58 T.C.M. (CCH) at 258.  Because substantial authority does not exist for the Westbrooks' position, the Commissioner correctly assessed the substantial underpayment penalty.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the tax court.

31